RECEIVED

JUL 2 1 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

CIVIL SUIT NUMBER 184,363

DIVISION "B"

DR. CARLTON L. WINBERY,
DR. FREDERICK L. DOWNING,
DR. JAMES R. HEATH AND DR.
CONNIE R. DOUGLAS

9TH JUDICIAL DISTRICT COURT

VERSUS

PARISH OF RAPIDES

LOUISIANA COLLEGE,
LEON HYATT, JR.,
JOE AGUILLARD,
KENT AGUILLARD,
ALAN SHOEMAKER,
AMY RUSSELL and
LOUISIANA INERANCY FELLOWSHIP

**1:06cv1254
JUDGE TRIMBLE
MAG. JUDGE KIRK**

STATE OF LOUISIANA

## PETITION FOR DAMAGES *EX CONTRACTU* AND *EX DELICTI* AND FOR SPECIFIC PERFORMANCE UNDER CONTRACTUAL OBLIGATIONS,

NOW INTO COURT, through undersigned counsel, come plaintiffs herein, DR. CARLTON L. WINBERY, DR. FREDERICK L. DOWNING, DR. JAMES R. HEATH and DR. CONNIE R. DOUGLAS, (collectively, "Plaintiffs") who, with respect, show the Court:

### I.    PARTIES

1.

Plaintiff herein, Dr. Carlton L. Winbery ("Dr. Winbery"), is a former member of the faculty of Louisiana College and former Chairman of the Religious Studies Division. Dr. Winbery, a New Testament and Greek Scholar, is a resident and domiciliary of Rapides Parish, Louisiana.

2.

Plaintiff herein, Dr. Frederick L. Downing ("Dr. Downing"), is a member of the faculty of Louisiana College and former Interim Chairman of the Religious Studies Division.  Dr. Downing, an Old Testament and Hebrew Scholar, is a resident and domiciliary of Rapides Parish, Louisiana.



EXHIBIT
**1**

3.

Plaintiff herein, Dr. James R. Heath ("Dr. Heath"), is a member of the faculty of Louisiana College. Dr. Heath, a Professor of Theology and Biblical Studies, is a resident and domiciliary of Rapides Parish, Louisiana.

4.

Plaintiff herein, Dr. Connie R. Douglas ("Dr. Douglas"), is a member of the faculty of Louisiana College in the English Department. Dr. Douglas is a resident and domiciliary of Rapides Parish, Louisiana.

5.

Louisiana College is a Louisiana non-profit corporation which may be served through its duly registered agent for service of process, Dr. Joe Aguillard, 1140 College Drive, Pineville, Louisiana 71359.

6.

Defendant herein, Leon Hyatt, Jr. ("Hyatt") is a resident and domiciliary of Rapides Parish, Louisiana, who may be served at 438 Azalea Lane, Pineville, Louisiana, 71360.

7.

Defendant herein, Dr. Joe Aguillard ("J. Aguillard") is a resident and domiciliary of Rapides Parish, Louisiana, who may be served at 1140 College Drive, Pineville, Louisiana, 71359.

8.

Defendant herein, Alan Shoumaker ("Shoumaker") is a resident and domiciliary of East Baton Rouge Parish, Louisiana, who may be served at 9135 Jefferson Highway, Baton Rouge, Louisiana, 70809.

9.

Defendant herein, Kent Aguillard ("K. Aguillard") is a resident and domiciliary of St. Landry Parish, Louisiana, who may be served at 141 South 6th Street, Eunice, Louisiana, 70535-4513.

10.

Defendant herein, Amy Russell ("Russell") is a resident and domiciliary of Catahoula Parish, Louisiana, who may be served at 153 Patricia Road, Jonesville, Catahoula Parish, Louisiana 71343.

11.

Defendant herein, Louisiana Inerrancy Fellowship ("LIF"), is an unincorporated association which may be served as a party defendant pursuant to LSA-C.C.§738 and served with process in accordance with LSA-C.C.P. §1264. Plaintiffs aver that this defendant has appointed no agent for service of process, nor is there any place where the business of the group is regularly conducted so as to serve any managing official.

## II.    FACTS

12.

In 1995, Plaintiffs herein filed suit against Hyatt, the Louisiana Conservative Resurgency ("LCR" - forerunner of LIF), and certain other members of such unincorporated association for damages under various causes of action, including defamation and intentional infliction of emotional distress.

13.

Said lawsuit was compromised and settled, with the terms of settlement as follows:

(a)    The Defendants paid $40,000.00.

(b)    Hyatt issued a letter of apology to each Plaintiff (jointly, the "apology letters"), which were made a part of the public record (copies are attached as *Exhibit "A"*, in globo).

(c)    The deposition transcript of Rev. Rick Henson was made a part of the public record; and

(d)    Louisiana College ("LC"), by and through the action of its Board, entered into an agreement with Plaintiffs (the "Agreement," a copy of which is attached as *Exhibit "B"*).

The settlement terms and conditions were judicially approved, therefore, as these claims of Plaintiffs, in large part, constitute a breach of said agreement, this action has been filed under the same suit number and division as the original suit.

14.

Hyatt's apology letters as to each Plaintiff stated that he was sorry for any and all harm or pain suffered by Plaintiffs. Hyatt also noted that each Plaintiff was "a dedicated scholar, a sincere person and a skillful teacher" and that each Plaintiff had "devoted his life to Christian teaching at Louisiana College." Hyatt further admitted in the apology letters that he and his group wanted to alter institutional teaching policies and philosophies at LC but did not intend to personally harm any of the Plaintiffs. Nevertheless, Plaintiffs become *civilian casualties* in the war for control of LC and other Louisiana Baptist institutions that continues to this date.

15.

In the Agreement, LC, by and through its Board, agreed to take *no adverse action* against Plaintiffs for their having sued the Defendants in the original suit, with adverse action being defined illustratively (but not exhaustively) as:

(a)   Termination;
(b)   Suspension;
(c)   Reprimand, Rebuke or Censure;
(d)   Adverse Comment or Report in the Personnel File;
(e)   Adverse or Negative Recommendation of Job Performance or Character;
(f)   Loss of or challenge to rights of tenure;
(g)   Reduction in Salary;
(h)   Loss of current job status (Department Head, etc.);
(i)   Public Criticism;
(j)   Denial of future salary increases or promotion; or
(k)   Any other action that could be considered adverse or detrimental to Plaintiffs as a consequence of their prior conduct.

In addition, the Board affirmed the Plaintiffs for "past dedication and commitment to LC and its students."

16.

For many years, various groups (including LCR and LIF) have acted in concert and lockstep with certain factions within the Louisiana Baptist Convention ("LBC") and Southern Baptist Convention ("SBC") commonly referred to as "fundamentalists" for the purpose of electing their members and/or persons of similar view to offices within the SBC and LBC. Such election to offices in the SBC and LBC has provided the power of patronage and appointment in order to fill committee, agency and board positions in such

a fashion so as to control and dominate the membership and direction of the various boards, agencies and institutions of the LBC and SBC.

17.

More specifically, by assisting in the successful election of the President of the LBC, members or persons of similar view may be appointed to Nominating Committees who recommend individuals for service on the Board.

18.

Pursuant to its charter, the Board is the governing body for LC, with authority to hire and fire faculty, or to even exclude from consideration those persons of contrary view.

19.

Hyatt has continued to seek institutional and policy change at LC and has succeeded in getting elected to the Board along with others of his same ideology. K. Aguillard, Shoumaker and Russell have all been elected to the Board. J. Aguillard has been selected as LC's new president despite the college's failure to follow its own bylaws. The legality of such selection is still a matter in litigation.

20.

Despite the prior assertions contained in the apology letters, Hyatt and certain members of the Board have continued even to the present date to public denounce and criticize Plaintiffs and further state that they should be fired.

21.

Packets of letters, defamatory in nature, continue to be circulated by Hyatt, K. Aguillard and other members of the Board, which criticize not only their professional reputation, but also their moral character. These packets raise the same issues as those asserted in the letter-writing smear campaign by fundamentalists, which provoked the filing of the original suit.

22.

One letter in such packet, written by Russell, greatly distorts the views and teachings of Dr. Winbery and Dr. Heath. Russell did not comply with established school policy regarding student concerns over subject matter. Rather, Russell took the matter directly to J. Aguillard, who then provided it to Hyatt with the letter ultimately becoming

part of the disseminated packet of defamatory material.  Russell was rewarded for such letter by her nomination and election as a Trustee to the Board along with Hyatt.

23.

Such statements attack the basic moral character of a minister of God and Professor of Religion, wrongfully offering up these plaintiffs for public ridicule based upon the political agenda of those who may disagree with them on finer points of theology.

24.

During the summer of 2004 through January of 2005, Plaintiffs were advised of actions on behalf of the Defendants, which reflected a continuation of the fundamentalists' tactic of raising *false fears* and employing *precinct politics* to gain control of LC and other Baptist institutions.

25.

J. Aguillard became upset concerning certain textbooks that his daughter read while a student at LC.   Rather than following procedures that he was clearly familiar with in the Faculty Handbook, J. Aguillard took the matter directly to then President, Dr. Rory Lee.  When Dr. Lee did not take the action he desired, J. Aguillard took his grievance to Hyatt and other fundamentalist LIF members.

26.

In May of 2003, Hyatt, J. Aguillard, K. Aguillard, Darrell Hoychick, Tommy French, Carl Carrigan, and other LIF members and Trustees at LC met at Trinity Baptist Church in Deville, Louisiana for the purpose of devising a plan to remove Dr. Rory Lee as President,and electing Hyatt to the Board.  The stated reason was that Dr. Lee had not taken action against certain faculty members, including Plaintiffs here, whom Hyatt had previously praised in his apology letters as a "a dedicated scholar, a sincere person and a skillful teacher" who had "devoted his life to Christian teaching at Louisiana College." When other attendees denounced such tactics, they were shouted down and told to leave. At this meeting, J. Aguillard was lobbying the attendees for a position in administration at LC.

27.

Following thereafter, Hyatt was elected as Trustee in the fall of 2003.

28.

Upon Hyatt's election, along with others of his narrow and credalistic view of education in general, and of the Bible, specifically, the Board composition and involvement in the day-to-day activities of LC radically and fundamentally changed.

29.

In December of 2003, Hyatt proposed a resolution that radically changed the method by which the faculty would select and employ textbooks in their teaching materials. The proposed book-screening process called for all classroom materials to be screened by the Vice-President of Academic Affairs, then, Mr. Ben Hawkins. However, the proposed resolution went further, as it allowed the President to dismiss any faculty member if the President believed the teaching materials were inappropriate. Thus, under this mindset, the selection of a President to bend to Hyatt and his allies' will became clearly evident.

30.

Among the banned books were *The Road Less Traveled* by Scott Peck and *A Lesson in Dying*, by Ernest Gaines, who received the Pulitzer Prize for literature for such work, and whom was to speak to LC as a visiting scholar and lecturer. Not surprisingly, Mr. Gaines later declined LC's invitation to speak there, rather opting to speak at Louisiana State University at Alexandria.

31.

The book-screening policy advocated by Hyatt and other members of the Board was ultimately rescinded following a firestorm of public criticism and threatened withdrawal of alumni support. That book policy, which violated principles of Academic Freedom, set forth by the American Association of University Professors ("AAUP"), also formed one of the bases upon which the college was placed upon academic probation in December of 2004. Those same principles of Academic Freedom set forth by the AAUP have been incorporated in the Faculty Handbook and bylaws of LC.

32.

Ultimately, Dr. Lee resigned rather than deal with the unyielding pressure from LIF, Hyatt and their supporters.

33.

The Vice-President of Academic Affairs, Dr. Ben Hawkins, also announced his retirement and left for a position with a North Carolina college.

34.

Hyatt and his allies did not stop with the forced resignations of the President and the Vice-President and Dean of Academic Affairs. They further desired to change the leadership of the Board, whose President at the time was Dr. Joe Nesom. This action was in retaliation for Dr. Nesom's call for the resignation of Mary Moffett, a LIF member, for her alleged failure to perform certain duties incumbent upon her as a board member and officer of the board. Ms. Moffett and Dr. Hyatt are political allies on the Board.

35.

Having now successfully removed the college President, the Academic Dean and the President of the Board, the Board then sought to select a President who would comport to their view of LC. Ultimately, Dr. Malcolm Yarnell was proposed as the new President, however, Dr. Yarnell and the Hyatt faction on the Board disagreed on issues of institutional control and related matters and the position was never filled.

36.

Then, in contravention of LC's by-laws, the Board sought to expand the search committee by adding more pro-Hyatt/LIF members. Shortly thereafter, the President Search Committee was "directed" to bring the name of J. Aguillard to the Board for an up-or-down vote on J. Aguillard's candidacy, regardless of the search committee's own views and recommendations. In fact, J. Aguillard was never listed in the top 9 candidates, and would not have received an interview but for the intervention of members of the Hyatt faction on the Board. By a faculty vote of more than 2 to 1, the faculty voiced a "no confidence" vote in J. Aguillard.

37.

By a very narrow vote (17-14), J. Aguillard was elected President. Shortly thereafter, a lawsuit was filed by a number of prominent Baptists and Dr. Winbery, who was the faculty representative on the Search Committee challenging the legality of the actions of the Board. That matter was tried with the District Court finding that the Board did violate its own by-laws in creating an expanded search committee. The District Court

also ruled that J. Aguillard could be elected by nominations from the floor regardless of whether the search committee had concluded its work or made its nomination to the full Board. That matter is now on appeal to the Third Circuit Court of Appeal.

38.

Hyatt and his LIF allies continue to call for the firing of Plaintiffs, although their course content, methods, or views have not changed in any substantive way since Hyatt's apology letter labeled each Plaintiff as "a dedicated scholar, a sincere person and a skillful teacher" who had "devoted his life to Christian teaching at Louisiana College."

39.

In September of 2004, the Southern Association of Colleges and Schools ("SACS"), the entity that grants or denies accreditation to Southern colleges and universities, concluded an investigation into recent Board actions outlined above. As a result, LC was place on academic probation for one (1) year for the only time in the college's entire history.   While LC has recently been removed from its probationary status, SACS will continue to monitor Board and administration actions as they impact shared governance and academic freedom.

40.

The Board rescinded its book screening policy under the recommendations of consultants hired to assist the college in being removed from academic probation.  Now, another book policy, hardly to be substantively distinguished from the earlier one, had been implemented, even at a time when such policy was one of the very actions by the Board that landed LC on academic probation.

41.

Hyatt and his board allies, including Shoumaker, K. Aguillard and Russell continue to call for the firing of Plaintiffs herein, despite their tenured service, and adherence to the by-laws of the Board and the provisions of the Faculty Handbook, both of which expressly adopt the principles of Academic Freedom set out by the American Association of University Professors (AAUP).

42.

In addition to these actions against Plaintiffs collectively, Defendants have also committed acts for which they are liable to certain individual Plaintiffs.

43.

Shoumaker had made statements in both print and word to third persons that Dr. Douglas has shown a film regarding the study of Shakespeare's *Hamlet* that is pornographic and displays full frontal nudity, when, in truth, Shoumaker had never even seen the film, which is rated PG-13, which is an acceptable film rating for viewing by students pursuant to long-standing LC policies.   Such allegations are clearly malicious and defamatory and caused great injury and distress to Dr. Douglas and to her public, academic and professional reputation.   Students and faculty members have called upon Shoumaker to publicly apologize.   To date, Shoumaker has not done so.   Further, no disciplinary action against Dr. Douglas has ever been threatened, much less instituted. Given the Board's authority, such non-action is an outright admission of no wrongdoing by Dr. Douglas.

44.

In the fall of 2004, Dr. Winbery announced his retirement following the spring semester and resignation as Chair of the Religion Department.   Neither Dr. Downing nor Dr. Heath were ever contacted, interviewed or communicated with regarding the opening, despite the fact that both were tenured faculty member with long-standing service to LC. Dr. Downing had previously served as Interim Dean of the religion Department with great competency.   He had also previously served on several SACS survey teams.   The position of "Interim Department Chair" was given to a member of the Religion Department who was non-tenured and without any prior service in such capacity or with regard to SACS survey or investigation activities.   It has been made perfectly clear to Dr. Downing and Dr. Heath that the Board would give the Department Chair to "anyone other than them." Such retaliatory action is a clear violation  of the Board's contractual commitments made in the Agreement regarding *adverse action*.   The failure to even interview, much less select, Dr. Downing or Dr. Heath had injured or harmed their public, academic and professional reputations as well as deprived them of institutional advancement and increases in compensation.

# III.    CAUSES OF ACTION

## A.    Defamation

### 45.

The allegations of paragraphs 1 through 44, inclusive, are incorporated herein as set forth *in extenso*.

### 46.

Defendants herein are guilty of issuing, publishing, communicating and disseminating defamatory statements against Plaintiffs herein, in both word and print, all with the intent to harm their reputation and standing in their local and denominational community with the further intent to expose plaintiffs to ridicule, contempt, hatred, all with malice.  The claims made against Plaintiffs herein are absolutely and patently false.

### 47.

As a result, plaintiffs have suffered injury to their personal, public and professional reputation, embarrassment, mental anguish, suffering as well as pecuniary loss and loss of income, for which they seek damages against defendants, *in solido*, for such amounts as this court, or the ultimate finder of fact, may deem appropriate.

## B.    Intentional Infliction of Emotional Distress

### 48.

The allegations of fact contained in paragraphs 1 through 44, inclusive, arevincorporated herein as though set forth herein *in extenso*.

### 49.

Through the extreme and outrageous conduct of defendants herein, Plaintiffs have suffered injury to their personal, public and professional reputation, embarrassment, mental anguish, suffering as well as pecuniary loss and loss of income, for which they seek damages against defendants, *in solido*, for such amounts as this court, or the ultimate finder of fact, may deem appropriate.

### C.   Negligent Infliction of Emotional Distress

#### 50.

The allegations of paragraph 1 through 44, inclusive, are incorporated herein as set forth *in extenso*.

#### 51.

In the alternative, Plaintiffs aver that the defendants have caused great emotional harm and mental distress to plaintiffs.

#### 52.

As a result of the negligent actions referenced above, defendants have breached a lawful duty pursuant to LSA-C.C.§2315 and as a result, plaintiffs have suffered injury to their personal, public and professional reputation, embarrassment, mental anguish, suffering as well as pecuniary loss and loss of income, for which they seek damages against defendants, *in solido*, for such amounts as this court, or the ultimate finder of fact, may deem appropriate.

### D.   Breach of Contract

#### 53.

The allegations of paragraph 1 through 44, inclusive, are incorporated herein as set forth *in extenso*.

#### 54.

The actions of Hyatt, Aguillard, Shumaker along with other members of the Board constitute a breach of the Agreement.

### E.   Violations of LC Bylaws

#### 55.

The allegations of paragraph 1 through 44, inclusive, are incorporated herein as set forth *in extenso*.

#### 56.

Inasmuch as the LC Bylaws adopt, refer to and incorporate the AAUP's Principles of Academic Freedwom, violations of such principles of academic freedom constitute a violation of LC's own bylaws.  As such, Defendants actions infringe upon and are

designed to have a chilling effect upon rights of academic freedom accorded Plaintiffs herein as well as the other members of the faculty.

### F.    Violations of Faculty Handbook

57.

The allegations of paragraph 1 through 44, inclusive, are incorporated herein as set forth *in extenso* .

58.

The actions of Hyatt, K. Aguillard, Shoumaker along with other members of the Board violate principles of academic freedom long afforded to faculty at LC by virtue of the Faculty Handbook.  As such, Defendants actions infringe upon and are designed to have a chilling effect upon rights of academic freedom accorded Plaintiffs herein as well as the other members of the faculty.

## III.    REMEDIES SOUGHT

59.

Plaintiffs seek and are entitled to those damages which are just and true in these premises.

60.

Plaintiffs seek and are entitled to specific performance under the Agreement, LC By-laws and Faculty Handbook.

## IV.    REQUEST FOR TRIAL BY JURY

62.

Plaintiffs herein allege that damages that they have suffered and endured to date, as well as into the future, greatly exceed the jurisdictional amount for trial by jury, thus, plaintiffs request that all issues herein be tried by jury.

WHEREFORE, plaintiffs pray:

1.  That defendants be served with a copy of the Petition and be duly cited to appear and answer same.

2.  That after due proceedings are had and trial hereof, there be judgment herein in favor of plaintiffs and against defendants, *in solido*, for all damages which are deemed to be just, due and owing in these premises, as well as legal interest on all sums from date of judicial demand until paid, with all costs of court being assessed against defendants.

3.  For all just, full and equitable relief.

4.  That all issues triable herein be by jury.

Respectfully submitted,

SOOTER & ASSOCIATES
A Limited Liability Company

BY: _____
Victor H. Sooter
Bar Roll No. 12263
P.O. Box 1671
Alexandria, LA  71309
(318) 448-8301

ATTORNEYS FOR PLAINTIFFS

Service Instructions:

Please withhold service until instructed.

CIVIL SUIT NUMBER 184,363

DIVISION "B"

DR. CARLTON L. WINBERY,                   9TH JUDICIAL DISTRICT COURT
DR. FREDERICK L. DOWNING,
DR. JAMES R. HEATH AND DR.
CONNIE R. DOUGLAS

VERSUS                                    PARISH OF RAPIDES

LOUISIANA COLLEGE,
LEON HYATT, JR.,
JOE AGUILLARD,
KENT AGUILLARD,
ALAN SHOEMAKER,
AMY RUSSELL and
LOUISIANA INERANCY FELLOWSHIP            STATE OF LOUISIANA

# O R D E R

Upon considering the foregoing, it is

ORDERED that the captioned matter be tried by jury upon Plaintiff's furnishing
bond or security in accordance with law.

Alexandria, Rapides Parish, Louisiana on this the _12th_ day of
_December_, 2005.

_____
JUDGE-9th JUDICIAL DISTRICT COURT

CIVIL SUIT NUMBER 184,363

DIVISION "B"

DR. CARLTON L. WINBERY,
DR. FREDERICK L. DOWNING,                    9TH JUDICIAL DISTRICT COURT
DR. JAMES R. HEATH AND DR.
CONNIE R. DOUGLAS

VERSUS                                        PARISH OF RAPIDES

LOUISIANA COLLEGE,
LEON HYATT, JR.,
JOE AGUILLARD,
KENT AGUILLARD,
ALAN SHOEMAKER,
AMY RUSSELL and
LOUISIANA INERANCY FELLOWSHIP                 STATE OF LOUISIANA

# REQUEST FOR NOTICE

NOW INTO COURT, through undersigned counsel, come Plaintiffs, in the above entitled and numbered cause, and requests written notice of trial pursuant to Louisiana Code of Civil Procedure Article 1572 and further request written notice of all final judgments and interlocutory judgments pursuant to Louisiana Code of Civil Procedure, Articles 1913 and 1914, in regard to all hearings held in the above captioned matter.

Respectfully submitted,

**SOOTER & ASSOCIATES**

BY: _____
Victor H. Sooter
Bar Roll No. 12263
P.O. Box 1671
Alexandria, LA  71309
Telephone (318)448-8301
Facsimile  (318) 449-1958

Attorneys for:

**Plaintiffs**